United States District Court
Southern District of Texas
ENTERED

AUG 2 4 2012

David J. Bradley, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| In re: | § | Bankruptcy Case No. 05-21207 |
| | § | Chapter 11 |
| ASARCO LLC, et al., | § | |
| | § | Jointly Administered |
| Debtors. | § | |
| SCRIP WORLD, LLC, | § | |
| Appellant | § | |
| | § | |
| v. | § | Civil No. 2:11-228 |
| | § | |
| ASARCO LLC, et al., | § | |
| Appellees. | § | |

**MEMORANDUM OPINION AND ORDER**

The United States Bankruptcy Court for the Southern District of Texas denied an application of appellant Scrip World, LLC ("Scrip World") for allowance and payment of administrative expense claims arising from the alleged breach of an agreement between it and ASARCO LLC ("ASARCO"). The Bankruptcy Court found that Scrip World failed to prove it was entitled to an administrative expense claim because the parties' agreement was terminated before the alleged breach occurred. The Court also found in the alternative: (1) even if the agreement was not terminated, the appellee's execution of a contract with a third party did not constitute a breach because the parties' agreement was not exclusive; and (2) even if the agreement was not terminated the appellant failed to prove that its expense claims are entitled to administrative priority status under the Bankruptcy Code. The appellant has appealed the Bankruptcy Court's order denying its application on several grounds. While this Court finds that the parties' agreement was not properly terminated, and consequently did renew as per the contractual renewal provision, the appellant is not

1

entitled to damages resulting from the appellee's contract with a new vendor during the renewed term because this did not constitute a breach of the Scrip World agreement. Accordingly, the Bankruptcy Court's order denying administrative expenses [Docket No. 16190] is affirmed and its findings of fact and conclusions of law [Docket No. 16156] are affirmed in part and vacated in part.

1.      **Facts and Procedural History**

This appeal concerns an agreement between the parties for the provision of pharmacy benefits management services. On August 9, 2005, the appellee, ASARCO, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On November 13, 2009, this Court confirmed a reorganization plan for ASARCO. Pursuant to this plan, holders of administrative claims against ASARCO were required to file applications for allowance and payment of those administrative expense claims by January 25, 2010.

Meritain Health, Inc. ("Meritain"), the parent company of appellant Scrip World, entered into an agreement with ASARCO to serve as a third party administrator of ASARCO's health care plans.[1] The administrative services provided by Meritain included pharmacy benefits management, a service offered by Scrip World. Two years after ASARCO's bankruptcy petition date, Scrip World also entered into an agreement with ASARCO to provide pharmacy benefit services (the "Agreement").

The original term of the Agreement was October 1, 2007 through September 30, 2008. This term was subject to an automatic renewal provision, which provided that the Agreement would automatically renew unless either party tendered a written notice of termination pursuant to the terms of the contract. In ASARCO's case, notice of termination was due at least ten days prior to the end

---

[1]There is a separate appeal concerning a dispute between Meritain and ASARCO, which will be addressed by the Court in a different order.

of the term (in other words, by September 20th).[2]  Pursuant to this provision, the Agreement was automatically renewed for a second term from October 1, 2008 to September 30, 2009.

During the second term, ASARCO employed Lockton Companies ("Lockton") as a consultant to issue Requests for Proposal ("RFP") in order to solicit bids for the next third party administrator of ASARCO's health care plans. Meritain and Scrip World participated in this bidding process.

Lockton was also authorized to send a notice to Scrip World / Meritain respecting the upcoming term of the Agreement. On September 17, 2009, Jayne Prior ("Prior") of Lockton, acting as ASARCO's agent, e-mailed Stacey Meade ("Meade"), a client relationship manager for Meritain who was authorized to act on Scrip World's behalf. This e-mail read:

> In the Scrip World/Meritain Client Agreement effective 10/1/2007 with ASARCO LLC, it requires a minimum ten (10) days advance notice of intent to non-renew. To fulfill that requirement, please accept this transmittal as your notification of ASARCO's intent to terminate its relationship with Scrip World during the upcoming contract period. The target date for this cancellation is November 30, 2009; however, pending labor discussions, the date may be moved to December 31, 2009.
>
> Please confirm your receipt of this notification and your acknowledgment of the same. Also, take the steps you find appropriate to affect this change within your organization. Should you have any questions, feel free to call.

The Bankruptcy Court concluded, as a matter of law, that this provided effective notice of

---

[2]The relevant provision of the Agreement stated:

> 17.3. Renewal. This Agreement shall automatically renew at newly quoted rates for twelve months at each anniversary of the Effective Date unless either party has provided the other party with written notice of the intent not to renew (which shall be deemed a termination) by thirty (30) days before the anniversary in the case of notice by [Scrip World], and by ten (10) days before the anniversary in the case of notice by [ASARCO].

3

ASARCO's intent to terminate the Agreement. In an e-mail response, Meade confirmed her receipt of the message:

> Please accept this as confirmation of receipt of your e-mail. To clarify, is this a final decision of intent to terminate or is this to preserve ASARCO's rights as they consider their options?

To this inquiry, Prior answered,

> This is to preserve ASARCO's rights until we receive a final response from the represented employees.

Meade forwarded Prior's September 17, 2009 e-mail to Scrip World officers. Meade also wrote in her e-mail:

> Please see the e-mail below on ASARCO. This group has put Meritain on notice they will be term[inat]ing, as a way of fulfilling their notice requirements under our agreement. They have said they may rescind the term notice, depending on the outcome of the RFP is under consideration.
>
> That being said, the e-mail is more strongly worded than the notice we received on the Meritain contract. I will do some probing to see what our chances are but I would prepare as though this group will be terminating 12/1/09.

After the September 17, 2009 e-mail, Scrip World continued to provide ASARCO with services pursuant to the Agreement. On October 21, 2009, Meade sent another e-mail to Prior stating, in pertinent part:

> With regard to the Scrip World contract, the contract did renew for a 12 month period. If ASARCO would like to get this on a 1/1 renewal, we can off[er] an extension that will allow the contract to renew 1/1/2011.
>
> Please let me know how ASARCO would like to handle the renewal and if they would like to request an extension on the Scrip World contract.

On November 24, 2009, ASARCO's corporate benefits manager, Darrell Sawyer ("Sawyer"), sent an e-mail to Meade and others, which read, in part:

4

> [S]ome time ago (9/21/2009) we notified Meritain of our intent to terminate our contract with Scrip World/Express Scripts. The target termination date was identified as 11/30/2009; however, we reserved our right to terminate no later than 12/31/2009.
>
> This e-mail to you is to confirm you of our intent to terminate ASARCO LLC's relationship/contract effective 12/31/2009.

Scrip World was not asked to and did not provide any services to ASARCO after December 31, 2009.

On January 25, 2010, Scrip World timely filed its application for allowance and payment of administrative expense claims in the United States Bankruptcy Court for the Southern District of Texas. The application requested payment of two claims: (1) $630,578.48 for services rendered to ASARCO pursuant to the Agreement—$594,772.62 of which ASARCO has paid since Scrip World's application; and (2) at least $776,000 in damages for ASARCO's alleged breach of the Agreement.[3] The Bankruptcy Court entered its Findings of Fact and Conclusions of Law on Scrip World, LLC's Application for Allowance and Payment of Administrative Expense Claims, and later issued an order denying Scrip World's application. Scrip World appealed the Bankruptcy Court's order.

2.   **Analysis**

A.   **Standard of Review**

This court has jurisdiction over a bankruptcy appeal under 28 U.S.C. § 158(a)(1), and applies the standard of review generally applied by a federal appellate court. Findings of fact made by the Bankruptcy Court will not be set aside unless clearly erroneous, and conclusions of law reached by

---

[3]The difference between the $630,578.48 requested and the $594,772.62 paid is not the subject of this appeal.

the Bankruptcy Court are reviewed *de novo* by this court. *In re Idearc, Inc.*, 662 F.3d 315, 318 (5th Cir. 2011). The burden is on the appellant to show that a finding of fact made by a bankruptcy court is clearly in error. *Perry v. Dearing*, 345 F.3d 303, 309 (5th Cir. 2003). "A finding of fact is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Jacobsen*, 609 F.3d 647, 662 (5th Cir. 2010) (quoting *Becker v. Tidewater, Inc.*, 586 F.3d 358, 367 (5th Cir. 2009)).

### B. Was the Agreement Terminated?

The first issue presented on appeal is whether the Bankruptcy Court erred in its conclusion of law that the Agreement was terminated by ASARCO on October 1, 2009. As quoted above, the Agreement provided that ASARCO could terminate the Agreement by giving notice at least ten days before October 1, 2009. The Bankruptcy Court found that effective notice of termination was provided in a September 17, 2009 e-mail, which read in part:

> [P]lease accept this transmittal as your notification of ASARCO's intent to terminate its relationship with Scrip World during the upcoming contract period. The target date for this cancellation is November 30, 2009; however, pending labor discussions, the date may be moved to December 31, 2009.

In finding this to be effective notice of termination, the Bankruptcy Court reasoned that any deficiency resulting from the designation of dates in November and December that did not comply with the Agreement's notice requirements was cured by the "erroneous date rule." Given the Bankruptcy Court's reliance on the erroneous date rule and the patent ambiguity of the alleged notice, resolution of this issue turns on whether the erroneous date rule applies where the alleged notice of termination was ambiguously worded. For the reasons detailed below, this Court holds as a matter of law that it does not.

6

The erroneous date rule is a common law rule by which a court may consider a notice of termination effective as of the first valid termination date according to the terms of the contract, even though it purports to take effect on a date that does not comply with the contractual notice requirements. *See Shain v. Wash. Nat. Ins. Co.*, 308 F.2d 611, 614 (8th Cir. 1962) ("it is the general rule that where a contract, whether it be one for employment or for insurance or of a different kind, requires written notice of cancellation upon a stated time, a notice failing to meet the time requirement, but otherwise appropriate, is nonetheless effective upon the lapse of the time required by the contract"); *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, 706 F.Supp.2d 350, 356 (S.D.N.Y. 2009) (under New York jurisprudence the rule provides that "a termination notice which erroneously identifies the termination date is nonetheless sufficient to effect a termination as of the first proper termination date") (quoting *G.B. Kent & Sons, Ltd. v. Helena Rubenstein, Inc.*, 47 N.Y.2d 561, 419 N.Y.S.2d 465, 393 N.E.2d 460, 461 (1979)); *see also* J.B.G., Annotation, *Effect, After Lapse of Full Period, of Attempt to Terminate Contract Without Previous Notice, or Upon Notice Allowing Shorter Period than that Stipulated*, 126 A.L.R. 1110 (1940) (collecting cases); J.P.T., Annotation, *Effect, After Lapse of Full Period, of Attempt to Terminate Contract Without Notice, or Upon Notice Allowing a Shorter Period than that Stipulated*, 35 A.L.R. 893 (1925) (same).

In reaching its conclusion, the Bankruptcy Court relied upon precedent from both state and federal jurisdictions in which a notice containing an erroneous date was held to be sufficient notice of termination. Although the alleged termination notice in the case at bar also provided dates that did not comply with the Agreement's requirements, the Court finds as a matter of law that those cases are not controlling here. First, and most importantly, the alleged notice is worded in such a

way that it is ambiguous whether ASARCO was trying to commit to a certain date of termination or simply signal an intent to cancel on a date some time in the future. Second, the application of the rule would thwart a twelve month renewal provision in the Agreement that is favorable to the noticed party. These differences vitiate the purpose of the rule and the reasoning that supported its creation, and compel the conclusion that it is inapplicable.

### i. Was the Alleged Notice of Termination Clear and Effective?

The relevant cases clearly state that a prerequisite to application of the erroneous date rule is notice of termination that is unambiguous and otherwise proper. *See, e.g., All States Serv. Station v. Standard Oil Co.*, 120 F.2d 714 (D.C. Cir. 1941) (Vinson, J.) (holding rule applies only where "a notice, good in all other respect, such as being definite rather than a mere statement of future intention"). As stated by the Supreme Court of Utah,[4] "[i]t is generally accepted that a notice of termination or cancellation of a contract must be clear and unequivocal." *Glenn v. Reese*, 225 P.3d 185, 190 (Utah 2009). *See also Gray v. Bicknell*, 86 F.3d 1472, 1479 (8th Cir. 1996) ("a notice of termination must be 'clear, definite, unambiguous and unequivocal, and it properly may not be so characterized unless its meaning can be apprehended without explanation or argument' in order to be effective) (quoting *Baker v. Mo. Nat. Life Ins. Co.*, 372 S.W.2d 147, 152 (Mo. Ct. App. 1963)) (applying Missouri law). "The focus of any inquiry into the adequacy of cancellation 'is on whether the notice is sufficiently clear to apprise the other party of the action being taken.'" *Glenn*, 225 P.3d at 191 (quoting *L.A.-Nev. Transit Co. v. Marathon Oil Co.*, 985 F.2d 797, 800 (5th Cir. 1993)). In determining whether a sufficiently clear termination occurred, a court may consider the conduct of

---

[4]The parties stipulate that Utah law governs the contract, since a provision of their agreement states that the contract shall be interpreted and enforced in accordance with the laws of the state of Utah. In its conclusions of law, the Bankruptcy Court also relied upon Utah law.

8

the parties. *Id.* (citing *Morris Silverman Mgmt. Corp. v. W. Union Fin. Servs., Inc.*, 284 F.Supp.2d 964, 974 (N.D.Ill. 2003)).

The ambiguity in the correspondences at issue arises from both Prior's initial e-mail and her later "clarification." Although Prior's e-mail directly states that it is a "notification of ASARCO's intent to terminate," citing the relevant provision of the Agreement, she goes on to obscure ASARCO's intent with statements that do not reflect a present intent to terminate. First, the September 17, 2009 e-mail states ASARCO intends to terminate the Agreement "during the upcoming contract period." Use of the phrase "during the upcoming contract period" implies that ASARCO intended to renew the contract, but then terminate it at a time that contravenes the notice requirement of the Agreement. The "upcoming" period was October 1, 2009 to September 30, 2010, not the then-current period from October 1, 2008 to September 30, 2009. That this communicated ASARCO's intent to terminate at some time in the future is not just theoretical; it is borne out by the conduct of ASARCO. This conclusion is also supported by the months indicated in the notice, which are untimely. Second, instead of setting a firm date, the September 17, 2009 e-mail identifies a "target date" for termination and a date to which the termination "may be moved." These statements indicate that ASARCO only intended to convey a tentative date for termination, instead of a firm date. Finally, Prior's response states that the notice was not a final decision of intent to terminate, but rather was intended to "preserve ASARCO's rights." As argued by Scrip World in its brief, this also implies that, by sending the September 17, 2009 e-mail, ASARCO merely preserved and did not *exercise* its "right" to terminate under the Agreement. Finally, ASARCO had no right under the contract to terminate it in November or December of 2009. The erroneous date rule cannot cure these problems.

9

Thus, the e-mail allegedly providing notice of termination commingles both the contemplative phrase "intent to terminate" and language equivocating on this point, such as the expressed desire to only "preserve" the right to terminate. Given the inherent ambiguity of the notice, ASARCO did not give otherwise proper notice of termination, and, therefore, the erroneous date rule should not be applied. Further, any such internal ambiguity was compounded by its follow-up e-mail that it was not terminating. As the ambiguity of the alleged notice precluded application of the erroneous date rule, the so-called termination was ineffective and the contract continued in force.

### ii.  Would Application of the Erroneous Date Rule Further its Purpose?

Even if the alleged notice of termination was otherwise proper, application of the erroneous date rule in these circumstances would not further the rule's purpose. The rule reflects the view that if the parties agreed upon an adequate term of notice, the court's imposition of that term, where intent to terminate was clearly expressed, gives the parties the agreement for which they bargained. Such a result is presumably equitable. *Cf.* W.C. Crais, Annotation, *Effect of Attempt to Terminate Employment or Agency Contract Upon Shorter Notice than that Stipulated in Contract*, 96 A.L.R.2d 272 (1964) (in employment context, the rule "proceeds on the theory that the noticed party, usually the agent or employee, can suffer no harm from a notice which is otherwise proper but which erroneously designates the time of termination, so long as he is permitted to enjoy the fruits of the contract through the full time stipulated therein for notice"). Nevertheless, the use of this rule is only equitable where its application in fact gives the parties what they bargained for—and does not impose some additional hardship on the noticed party.

Here, since application of the rule would thwart the renewal provision beneficial to the

noticed party, the parties would not simply be held to their bargained-for term of notice. In each of the cases cited by the Bankruptcy Court and relied upon by ASARCO, the use of the rule simply allowed the court to recognize the termination as effective after the agreed-upon term of notice. Since the notice of termination provisions in those cases were not tied to an automatic renewal provision in the agreement, the extension of the term of notice did not affect or minimally affected the total term of the agreement. By contrast, the notice of termination provision here is linked with a mechanism by which the agreement automatically renews for one year. In other words, the parties did not merely agree upon a term of notice before the agreement would be terminated, they agreed that absent proper notice the agreement would be renewed. The effect of this interaction is to make strict compliance with the notice of termination provision particularly important. Otherwise, one or both of the parties may mistakenly prepare for another year of performance under the agreement, incurring significant costs. To take a relaxed view of compliance with the notice requirements under the agreement where an automatic renewal is also involved would not only set an unwise precedent—it also effectively rewrites the parties' contract. Although the Court here ultimately finds that Scrip World is not entitled to its administrative expense claim, a noticed party under similar circumstances might forfeit the dollar value of the renewed contract period. *See Shain v. Washington National Insurance Company*, 308 F.2d 611, 615 (8th Cir. 1962) (holding the rule should not apply where the noticed party would possibly forfeit "substantial, subsisting rights about to mature").[5]

C.  **Assuming the Contract Renewed, Was there a Breach and Was there**

---

[5]The Bankruptcy Court found that, under the erroneous date rule, the Agreement terminated on September 30, 2009. Even assuming that ASARCO's September 17, 2009 notice of termination was otherwise proper, and assuming that the erroneous date rule would apply to that notice, a proper application of that rule would instead terminate the Agreement on September 30, 2010.

**Damage?**

The second issue on appeal is whether the Bankruptcy Court erred in finding that ASARCO's entry into an agreement with another provider did not constitute a breach of the Agreement. The court reasoned that because the Agreement did not expressly provide that Scrip World would be ASARCO's exclusive provider of pharmacy benefit services, under the contract Scrip World did not have an exclusive agreement. For the reasons below, this Court agrees.

Scrip World has not pointed to a provision for exclusive dealing in the text of the Agreement. Nor does Scrip World point to any evidence in the record that convinces this Court that the Bankruptcy Court erred. Instead, Scrip World merely contends that the Court should find implied exclusivity, in view of the parties' intent at the time of contracting that Scrip World act as the exclusive provider to ASARCO of pharmacy benefits management services. The parties must have contemplated exclusivity, Scrip World argues, because Scrip World would not otherwise have been able to perform at the contracted rates.

Since Scrip World does not rely upon an express exclusive dealing clause within the Agreement, the Court must determine whether the parol evidence rule applies before looking to extrinsic evidence of an exclusive dealing contract. In Utah, the parol evidence rule "operates, in the absence of fraud or other invalidating causes, to exclude evidence of contemporaneous conversations, representations, or statements offered for the purpose of varying or adding to the terms of an integrated contract." *Tangren Family Trust v. Tangren*, 182 P.3d 326, 330 (Utah 2008) (emphasis omitted). "Thus, if a contract is integrated, parol evidence is admissible only to clarify ambiguous terms; it is 'not admissible to vary or contradict the clear and unambiguous terms of the contract.'" *Id.* (quotation marks omitted). Therefore, to determine whether the parol evidence rule

applies, a court must first determine whether the agreement is integrated. *Id.* If the agreement is integrated, parol evidence is only admitted if the language of the agreement is ambiguous. *Id.*

Here, the Agreement is clearly integrated. An integrated agreement is "a writing or writings constituting a final expression of one or more terms of an agreement." *Id.* (quotation marks omitted). Section 23 of the Agreement contains the heading "Entire Agreement," and states that the agreement and any addendum "constitute the entire agreement between the parties governing the subject matter of this Agreement." The Supreme Court of Utah has previously held that a similar integration clause entitled "Entire Agreement" was sufficient evidence that the agreement contains the entire understanding between the parties. *See id.* The similar provision here was sufficient to indicate that the parties intended the Agreement to be fully integrated.

Since the Agreement is integrated, before extrinsic evidence is admitted the Court must determine whether the agreement is ambiguous with regard to exclusive dealing. *See id.* Initially, a review of the contract reveals no clause dealing with exclusivity. During oral argument, counsel for Scrip World argues that Sections 2.1 and 2.1.2 of the Agreement compel a finding of exclusivity. These provisions read as follows:

> 2. <u>Set Up, Eligibility and Changes.</u>
>    2.1. Set Up and Eligibility. Prior to the provision of any services under this Agreement, [ASARCO] shall deliver to [Scrip World] a Client Implementation Form that contains (a) an accurate list of all then current Plan participants, (b) the terms of the Plan's prescription drug program, and (c) confirmation of the applicable formulary, and such Client Implementation Form shall meet the approval of [Scrip World].
>
> \* \* \*
>
>    2.1.2. Any changes to the information contained in the Client Implementation Form must be: (i) submitted by [ASARCO]

13

> to [Scrip World] as a signed amendment to the Client Implementation Form, in a form designated by [Scrip World], and (ii) approved by [Scrip World]. [Scrip World] shall have no responsibility for implementing any changes or providing any services in connection with any changes until it has approved the applicable amendment to the Client Implementation Form.

Counsel for Scrip World argued that these provisions indicate exclusivity because they require ASARCO to receive Scrip World's permission before amending the Client Implementation Form. In support of this contention, Scrip World directed the Court only to the two paragraphs in the Agreement quoted above. Even if extrinsic evidence of an exclusive dealing provision were admissible, Scrip World has not provided any such evidence. Without any evidence that it was necessary to amend the Client Implementation Form before doing business with another pharmacy benefits management vendor, or any other evidence that the contract is ambiguous with regard to exclusivity, the Court cannot find that these provisions suggest exclusivity or compel the conclusion that the contract is ambiguous in this regard. Scrip World also argues the Court should infer exclusivity because Scrip World would not have entered into a non-exclusive contract for reasons of commercial practicability. "Ambiguity may be found when a contract is missing an essential term." *DCH Holdings, LLC v. Nielsen*, 220 P.3d 178, 181 (Utah Ct. App. 2009) (citing *Stanger v. Sentinel Sec. Life Ins. Co.*, 669 P.2d 1201, 1205 (Utah 1983); *Novell, Inc. v. Canopy Group, Inc.*, 92 P.3d 768, 772–73 (Utah Ct. App. 2004); *Webb v. R.O.A. Gen., Inc.*, 804 P.2d 547, 551 (Utah Ct. App. 1991)). Although a non-exclusive arrangement may be less lucrative for Scrip World, it is not essential to the Agreement. While it is conceivable that provision of the agreed-upon services on a non-exclusive basis should have meant higher rates or different terms, Scrip World has not

provided any additional information about those rates or terms. Without this information, the Court is left to speculate about how the rates actually agreed upon might reflect the parties' intentions at contract formation. Nor has it suggested other extra-contractual remedies such as mutual mistake, accident, or fraud control the outcome. The Bankruptcy Court certainly did not so find. Since an exclusive dealing contract was not essential to the Agreement, the Court holds that the Agreement was not ambiguous on its face.

"[I]f the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language." *Ohio Cas. Ins. Co. v. Unigard Ins. Co.*, 268 P.3d 180, 184 (Utah 2012) (quoting *Benjamin v. Amica Mut. Ins. Co.*, 140 P.3d 1210, 1213 (Utah 2006) (internal quotation marks omitted)). A plain reading of the contract does not disclose any exclusive dealing arrangement. Therefore, the parties did not intend to provide for any such arrangement, and the Court will not infer that one existed.

As correctly reasoned by the Bankruptcy Court, without an exclusive dealing contract ASARCO's execution of a contract for pharmacy benefits management services with a third party during the term of its agreement did not constitute a breach. Therefore, Scrip World is not entitled to damages for a breach of the Agreement. *See Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001) ("The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."). For these reasons, Scrip World did not have a valid claim for administrative expenses, *i.e.* a breach of contract claim, and its application was properly denied. Since the Court's disposition on this issue is sufficient to sustain the Bankruptcy Court's ruling, the Court need not reach the parties' arguments regarding whether Scrip World failed to demonstrate the requirements for an

administrative expense claim.

**3.     Conclusion**

Based upon the foregoing discussion, the findings of fact and conclusions of law [Docket No. 16156] of the Bankruptcy Court are affirmed in part and vacated in part. That ruling is vacated to the extent that it concluded the erroneous date rule relieved ASARCO of any contractual obligations. It is affirmed with respect to its finding that ASARCO did not breach the Agreement and that Scrip World's application for administrative expenses based upon that alleged breach of contract was therefore properly denied. The order denying Scrip World's Application for Allowance and Payment of Administrative Expense Claims [Docket No. 16190] is affirmed.

Signed this 24th day of August, 2012.

Andrew S. Hanen
United States District Judge